**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **EDWIN CANIZALEZ,**<br><br>**460 L Street NW**<br>**Washington, DC 20001**<br><br>**Plaintiff,**<br>**v.**<br><br>**TASH,**<br><br>**2013 H Street Northwest,**<br>**Suite 715**<br>**Washington, DC 20006**<br><br>**and**<br><br>**RUTHIE-MARIE BECKWITH**<br><br>**2013 H Street Northwest,**<br>**Suite 715**<br>**Washington, DC 20006**<br><br>**Defendants.** | **Case No.:** ________________ |

**CIVIL COMPLAINT FOR MONETARY AND EQUITABLE RELIEF**

Plaintiff Edwin Canizalez ("Canizalez"), by and through undersigned counsel, files this suit against TASH for violations of the False Claims Act, 31 U.S.C. § 3730(h), Negligent Hiring and/or Supervision under the common law of the District of Columbia, and Wrongful Discharge in Violation of Public Policy under the common law of the District of Columbia.

**Introduction**

1. Edwin Canizalez joined TASH as an Events and Training Manager in February 2013. He received several promotions and pay raises, ultimately rising to the position of Director of Operations and Change Management.

2. TASH was founded in 1975 and advocates on behalf of people with significant disabilities.

3. Throughout nearly the entirety of Canizalez's tenure, he received exceptional performance evaluations reviews and was instrumental in increasing the organizations' annual revenues.

4. In or about early October 2016, TASH made the decision to hire Tia Nelis, then President of SABE, as a full time employee on a TASH subcontract with Self Advocates Becoming Empowered ("SABE"), the Self-Advocacy Resource and Technical Assistance Center ("SARTAC"), RFP HHS-2016-ACL-AOD-DNRC-0176

5. SABE is a recipient of grant funds from the United States government and, in exchange for TASH's work on SARTAC, SABE intended to pay TASH around $60,000 to $80,000 per year from the funds it received from the United States government for SARTAC.

6. As explained to Canizalez by TASH's Executive Director, Ruthie-Marie Beckwith, , Beckwith, with blessing from the Board of Directors, intended to compensate Nelis for her work on SARTAC by paying her out of the funds it received in support of a different federal program, the SWIFT grant.

7. The SWIFT grant is a U.S. Department of Education program, Award Number H326Y120005-13, led by the University of Kansas Center for Research ("KUCR"). TASH entered into a subcontracting agreement with KUCR to assist with work on the project.

8. Canizalez concluded that paying Nelis for her work on SARTAC out of funds awarded for the SWIFT project represented a conflict of interest, mismanagement of funds, and "a form of embezzling."

9. Further, the arrangement gave the appearance of a "kick-back," with Nelis, Board

President and Principal at SABE, seemingly awarding a subcontract to TASH in exchange for a paid position on the very same subcontract that she had awarded to TASH.

10. Finally, Canlizalez believed that the SWIFT project would be harmed, because the payment of such a "kick-back" served no benefit to the United States. Canizalez concluded that this constituted a gross mismanagement or waste of funds.

11. Canizalez engaged in protected activity under the False Claims Act when he made efforts to stop one or more violations of the False Claims Act by his former employer, TASH.

12. TASH was aware of Canizalez's efforts to stop it from committing one or more violations of the False Claims Act.

13. TASH violated Section 3730(h) of the False Claims Act when it unlawfully terminated Canizalez for his efforts to stop one or more violations of the False Claims Act by TASH.

14. TASH's Board of Directors failed to exercise a reasonable duty of care in its supervision of its Executive Director Ruthie Beckwith and its affirmation of the hiring of Tia Nelis, resulting in the foreseeable consequence of Canizalez's termination and subsequent damages.

15. TASH wrongfully discharged Canizalez in violation of the public policy of the District of Columbia after Canizalez disclosed violations of federal regulations governing conflicts of interest related to federal funds.

## Jurisdiction and Venue

16. This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331 because the claim arises under the laws of the United States of America.

17. The Court has personal jurisdiction over Defendant TASH because it has

substantial and deliberate contacts with the District of Columbia, and it conducts business in the District of Columbia at 2013 H Street Northwest, Suite 715.

18. The Court has supplemental jurisdiction over the claims brought under the common law of the District of Columbia pursuant to 28 U.S.C. § 1367 because the claims arise from the same nucleus of operative fact as the claims that arise under the laws of the United States of America.

19. Venue in this Court is proper under 28 U.S.C. § 1391 because of TASH's significant and deliberate contacts with this district and its presence in the District of Columbia.

20. Venue in this Court is proper under 28 U.S.C. § 1391 because the substantial majority of the events giving rise to this claim occurred in this judicial district.

## Facts

### A. Canizalez is the former Director of Operations and Change Management at TASH who had a successful tenure that saw increases in TASH's revenue.

21. Canizalez is a 45 year old male who lives in the District of Columbia.

22. TASH is a disability advocacy nonprofit that works to promote the rights and inclusion of persons who suffer from significant disabilities.

23. Canizalez began working at TASH in February 2013 as Events and Training Manager.

24. Canizalez received several promotions and significant salary increases during his tenure at TASH, ultimately becoming the Director of Operations and Change Management.

25. In his role as Director of Operations, Canizalez was responsible for the procurement of contracts under the rates and conditions that TASH was capable of meeting.

26. Canizalez was also responsible for helping implement a strategy for TASH to meet a long term goal of five million dollars in revenue annually.

27. As Director of Operations, Canizalez also oversaw the day-to-day activities of the organization under the direction of TASH's Executive Director.

28. During Canizalez's tenure as Director of Operations, TASH's revenue increased to $1.4 million in 2016, which was a 40 percent increase from the previous year.

29. Canizalez also implemented a "balanced score card" approach for contracts, which aided TASH in determining which contracts it could realistically pursue and meet.

30. The use of the "balanced score card approach" was responsible for generating roughly 50 percent of TASH's annual revenue.

**B. TASH hired Ruthie-Marie Beckwith as Executive Director in 2016.**

31. In or about June 2016, TASH hired Ruthie-Marie Beckwith as its new Executive Director.

32. Prior to Beckwith's hiring, TASH had been in the process of reviewing four federal grants for which TASH could apply.

33. Canizalez and his teams spent a great deal of time and resources identifying the contracts and grants that TASH would be able to bid for and execute successfully.

34. Shortly after Beckwith's arrival at TASH, Canizalez and his team met with Beckwith to brief her on the opportunities that TASH had the highest chance of winning.

35. In particular, Canizalez and his team recommended that TASH pursue the Request for Proposal (RFP HHS-2016-ACL-AOD-DNRC-0176) on a grant to build a Self Advocacy Resource and Technical Assistance Center (SARTAC).

36. The SARTAC Grant is a grant from the United States Department of Health and Human Services' Administration for Community Living.

37. The project's anticipated funding is $400,000 per year for the next five years.

38. The competition for the grant, per the terms of the RFP, was open to all domestic non-profit entities with or without 501(c)(3) status, so long as the applicant was not an institute of higher education.

39. The national resource center funded by the SARTAC grant is supposed to compile resources, best practices guides, training curriculum, and success stories to be stored in an online clearinghouse available to the public.

40. The SARTAC grant national resource center is also supposed to research the history of the self-advocacy and other civil rights movements to produce a report and webinar regarding the evolution, leadership, and best practices of these movements.

41. The national resource center funded by the SARTAC grant is intended to provide training and technical assistance to new self-advocacy entities, as well as established self-advocacy organizations across the United States.

42. The national resource center is supposed to work to establish mini-grants to disability organizations to create disability fellowships that offer leadership development and employment opportunities for fellows.

43. Beckwith spoke against pursuing this opportunity on the grounds that she felt doing so would "step on the toes" of another non-profit advocacy group, SABE.

44. Like TASH, SABE is a disability rights advocacy organization, which advocates for the full inclusion and expansion of opportunities to disabled persons.

45. On June 12, 2016, Beckwith sent an email to SABE representative Vicki Turnage and SABE President Tia Nelis, on which she copied Canizalez.

46. In this email, Beckwith stated in part that "On a personal level, having a national self-advocacy TA center led by SABE is a dream that I have nurtured ever since the national

conference was held in Nashville 25 years ago."

47. Beckwith assured Turnage and Nelis in this email that TASH would not submit an application for the SARTAC RFP "under its own name without SABE being part of an application."

48. Beckwith also offered TASH's sponsorship or support of SABE's application.

**C. Canizalez disclosed to Beckwith and to TASH's Board of Directors concerns about TASH Hiring Nelis in Exchange for a Subcontract on SARTAC.**

49. The next day, Canizalez sent an email to Beckwith, on which he copied Dawn Brown, Donald Taylor, Bethany Alvare, and Raquel Rosa.

50. In that email, Canizalez reiterated to Beckwith that the SARTAC RFP was one that TASH should pursue on its own, as it had the resources to do so successfully.

51. On or about June 15, 2016, Canizalez approached Board Treasurer Kathy Fallon and Board member Carvin Wilson regarding his concerns about Beckwith's email to Turnage and Nelis.

52. Canizalez spoke to Fallon and Wilson because of his concern that Beckwith's proposal to forego submitting a bid on the SARTAC RFP represented a conflict of interest on Beckwith's part.

53. Fallon and Wilson instructed Canizalez to move forward with his presentation as planned, including a pitch for the SARTAC RFP.

54. The same day, Canizalez gave a presentation to TASH's Board on the organization's future growth and strategic plan.

55. During the presentation, Canizalez discussed the SARTAC RFP, including its value to the organization.

56. But Beckwith announced during the same meeting that TASH would forego

submitting a bid on the SARTAC RFP and instead partner with SABE on the RFP.

57. The Board's Vice President, Ruby Moore, who is also a personal friend of Beckwith's, stated that it "would look bad" if TASH applied for the grant.

58. Fallon and Wilson also made statements to the effect that "Ruthie is the leader" and the Board should follow her as soldiers would follow direction, or words to that effect.

59. A few days after the meeting, Beckwith informed Canizalez that he should never disagree with her again or they "will not be working together in the future," or words to that effect.

60. After the meeting, TASH's Board of Directors agreed to partner with SABE on the RFP instead of allowing TASH to submit its own bid.

61. Shortly after TASH's Board made the decision to partner with SABE, Beckwith proposed that TASH should hire SABE President Tia Nelis as a full time employee and use the funds derived from the partnership with SABE on the SARTAC project to pay Nelis's salary.

62. Under this arrangement, Nelis, as President of SABE, would be responsible for determining the entities with which SABE would subcontract and managing those entities while, at the same time, receiving payments from those entities (such as TASH).

63. Additionally, as President of SABE when it applied for the SARTAC grant, Nelis, played a key role in applying for and implementing the grant.

64. As part of SABE's agreement with TASH, SABE agreed to pay TASH $15,000 per year - over a period of five years - of its SARTAC grant funds in exchange for hiring Tia Nelis.

65. In other words, Nelis played a key role in applying for and implementing a grant from which she personally benefits.

66. Nelis continues to be SABE's President and the key decider on the use and administration of SARTAC grant funds.

67. After Canizalez learned of this arrangement on or about October 6, 2016, he expressed his concern to Beckwith in an email that this arrangement would constitute a glaring conflict of interest for Nelis.

68. Specifically, Canizalez wrote in the email: "I'm very concerned about [Nelis's] signing an agreement which will personally and directly benefit her financially. This can easily be interpreted as mismanagement of funds at the very least, and a form of embezzling at the worst. We cannot hire Tia if we do this."

**D. Canizalez later learned that Beckwith planned to pay part of Nelis's salary from the funds of another unrelated federal grant.**

69. Later, Canizalez realized that the proposed salary for Nelis would be greater than the funds that TASH would receive as part of the partnership with SABE on the SARTAC project.

70. Canizalez asked Beckwith how she planned to pay the difference in Nelis's salary.

71. Beckwith informed Canizalez that she planned to use part of another federal grant – the SWIFT grant – in order to compensate Nelis on the SARTAC project.

72. The SWIFT Grant is the School Wide Integrated Framework for Transformation Center contract, on which TASH works as a subcontractor to the University of Kansas.

73. SWIFT is funded by a grant from the United States Department of Education.

74. SWIFT is funded by the Department of Education's Office of Special Programs Grant Number H326Y120005.

75. The SWIFT Center is a technical assistance center that operates primarily out of

the University of Kansas in Lawrence, Kansas.

76. The overarching goals of SWIFT are: to "build school capacity to provide academic and behavioral support to improve outcomes for all students" and to "transform U.S. public education so that all students are welcomed and included in their neighborhood schools and age appropriate general education classrooms with support."

77. The goals of TASH's work on the SWIFT project included: 1) the monitoring of federal policy and how it affects SWIFT; 2) providing technical assistance to state education agencies, local education agencies, and school systems in bringing about equity for all students; 3) develop case studies of policy successes for future use and replication; 4) serve as a resource for training for SWIFT Center staff; 5) engage community stakeholders most likely to be affected by the SWIFT Center's work; and 6) coordination of activities through the use of meetings.

78. In or about mid-October 2016, Canizalez informed Beckwith that he had concerns as to whether or not TASH could use SWIFT grant funds to pay for the shortfall in Nelis's projected salary because it was an education development policy subcontract funded by the United States government.

79. Beckwith said that this issue was of no concern because TASH would hire Nelis to serve as Director of Policy, which Beckwith said would cover policy development.

80. Canizalez's concerns stemmed, in part, from the fact that Beckwith had stated in a previous staff meeting that Nelis would need support after her hiring because Nelis did not know how to write policy or policy development proposals.

81. At a separate meeting with Canizalez, Beckwith stated that she planned to hire additional consultants to write policy documents and proposals.

82. Beckwith has hired former TASH Education Policy Director, Jenny Stonemeier as consultant, to conduct policy work for SWIFT grant deliverables while continuing to pay Nelis with SWIFT funds under her Policy Director role.

83. Jenny Stonemeier works full time as the Deputy Executive Director for APSE, another non-profit in the disability rights field.

**E. After Canizalez's disclosures to Beckwith, she became hostile toward him and ultimately terminated his employment on December 15, 2016.**

84. On December 15, 2016, Beckwith asked Canizalez to meet her in her office.

85. At the meeting, Beckwith told Canizalez that the Board of Directors no longer wanted his services at TASH.

86. Beckwith also told Canizalez that she had attempted to work with him since she started at TASH, but she had been unable to do so.

87. Canizalez reminded Beckwith that he had received a raise in October 2016, which included a second raise to be effective in January 2017,and that Beckwith had previously told him she was happy with his performance.

88. Beckwith told Canizalez that she had made the statement about his performance, but that "it does not matter anymore," or words to that effect.

89. Beckwith gave Canizalez the option of resigning, which Canizalez declined.

90. After Canizalez refused to resign from his position, Beckwith terminated his position.

91. Prior to his termination, Canizalez had no record of any disciplinary history while at TASH.

92. On December 18, 2016, Canizalez wrote an email to TASH's Board of Directors Ralph Edwards and requested a meeting to discuss the facts and circumstances of his

termination.

93. Edwards responded on December 20, 2016, and told Canizalez that "the decision to terminate employment falls within the purview of TASH's Executive Director and that decision is final."

**F. TASH and SABE, as recipients of federal grant money, were required by federal regulations to maintain strict controls regarding conflicts of interest.**

94. Recipients of federal grants must follow the requirements set forth in 2 C.F.R. § 200.101, *et seq*. 2 C.F.R. § 200.100(a)(1).

95. The requirements for recipients of federal grants must likewise be followed by subgrantees or subrecipients of federal awards, as the requirements "flow down." 2 C.F.R. § 200.101(b)(1).

96. Federal agencies that grant awards must establish conflict of interest policies for federal awards. 2 C.F.R. § 200.112.

97. Likewise, a non-federal entity receiving a federal award "must disclose in writing any potential conflict of interest to the federal awarding agency or pass-through entity in accordance with applicable federal awarding agency policy." 2 C.F.R. § 200.112.

98. A non-federal entity receiving a grant "must maintain written standards of conduct covering conflicts of interest and governing the actions of its employees engaged in the selection, award, and administration of contracts." 2 C.F.R. § 200.318(c)(1).

99. Under the regulations governing recipients of federal grants, "No employee, officer, or agent may participate in the selection, award, or administration of a contract supported by a federal award if he or she has a real or apparent conflict of interest." 2 C.F.R. § 200.318(c)(1).

100. Relevant regulations define a conflict of interest when "[an] employee officer, or

agent any member of his or her immediate family, his or her partner, or an organization which employs or is about to employ any of the parties indicated herein, has a financial or other interest in or a tangible personal benefit from a firm considered for a contract." 2 C.F.R. § 200.318(c)(1).

**COUNT I**
**Violation of the False Claims Act, 31 U.S.C. § 3730(h)**
**Retaliation**

101. Canizalez incorporates the allegations set forth in foregoing paragraphs as though fully alleged herein.

102. Canizalez is an "employee" within the meaning of the False Claims Act.

103. TASH is an "employer" within the meaning of the False Claims Act.

104. Canizalez engaged in protected activity under the False Claims Act when he took efforts to stop TASH from committing one or more violations of the False Claims Act.

105. Canizalez took efforts to stop one or more violations of the False Claims Act by TASH when he informed his supervisor, TASH Executive Director Ruthie-Marie Beckwith, that her proposal to pay part of Tia Nelis's salary out of funds derived from the Department of Education's SWIFT Center grant when Nelis's work was not for the SWIFT Center program was improper.

106. TASH, through Ruthie-Marie Beckwith, had knowledge of Canizalez's efforts to stop one or more violations of the False Claims Act because Canizalez directly disclosed his concerns about Beckwith's proposed plan to pay Nelis's salary to Nelis herself.

107. Following Canizalez's protected disclosure, TASH, through Beckwith, began to unlawfully retaliate against Canizalez for his protected activity.

108. In December 2016, TASH, through Beckwith, unlawfully terminated Canizalez's employment in retaliation for his protected disclosure.

109. The President of TASH's Board of Directors, Ralph Edwards, affirmed Beckwith's actions via email on December 20, 2016.

110. As a result of TASH's unlawful retaliation against him, Canizalez has suffered monetary and emotional distress damages.

**COUNT II**
**Negligent Hiring/Supervision**
**In Violation of the Common Law of the District of Columbia**

111. Canizalez incorporates the allegations set forth in foregoing paragraphs as though fully alleged herein.

112. At all times relevant to this complaint, TASH employed Canizalez and controlled the terms and conditions of his employment.

113. As Canizalez's employer, TASH had a duty to use reasonable care in the hiring and supervision of other employees so as not to cause harm to Canizalez.

114. In conspiring with SABE to have TASH abstain from bidding on the SARTAC Grant in exchange for a kickback for TASH to hire Nelis, Beckwith acted in an improper, incompetent, and illegal manner.

115. In planning to cover part of Nelis's salary with funds derived from the SWIFT Grant, a grant separate and unrelated to what Nelis's work would be at TASH, Beckwith acted in an improper, incompetent, and illegal manner.

116. TASH's Board of Directors had actual and/or constructive knowledge of Beckwith's improper and illegal activities, as Canizalez revealed to Board members Carvin Wilson and Kathy Fallon that Beckwith's actions on the SARTAC Grant RFP were improper and represented a potential conflict of interest.

117. TASH's Board of Directors had actual and/or constructive knowledge of

Beckwith's improper and illegal activities, as Board members witnessed a disagreement between Canizalez and Beckwith at a Board meeting in June 2016 as to whether TASH should apply for the SARTAC Grant.

118. TASH's Board of Directors had actual and/or constructive knowledge of Beckwith's improper and illegal activities, as Board members were aware of the hiring of Nelis in fall 2016.

119. TASH's Board of Directors affirmed Beckwith's improper and illegal activities in June 2016 when it voted not to apply for the SARTAC Grant and instead partner with SABE.

120. TASH's Board of Directors affirmed Beckwith's improper and illegal activities in fall 2016 when the Board took no action regarding the hiring of Nelis.

121. TASH's Board of Directors affirmed Beckwith's improper and illegal activities in December 2016 when Board President Ralph Edwards told Canizalez that Beckwith's decision to terminate his employment was within her purview and was final.

122. TASH's Board of Directors had actual and/or constructive knowledge that the affirmation of Beckwith's proposals on the SARTAC Grant and subsequent hiring of Nelis would lead to further opposition from Canizalez and further improper and illegal behavior from Beckwith.

123. TASH's Board of Directors failed to exercise a reasonable duty of care in its supervision and oversight of Beckwith in her role as Executive Director.

124. TASH's Board of Directors failed to exercise a reasonable duty of care in its affirmation of the hiring of Nelis by TASH.

125. Further improper and illegal behavior on the part of Beckwith was a foreseeable consequence of the Board's failure to exercise a reasonable duty of care in its supervision and

oversight of Beckwith and its failure to exercise a reasonably duty of care in affirming the hiring of Nelis.

126. Further opposition from Canizalez to Beckwith's actions was a foreseeable consequence of the Board's failure to exercise a reasonable duty of care in its supervision and oversight of Beckwith and its failure to exercise a reasonably duty of care in affirming the hiring of Nelis.

127. Beckwith's termination of Canizalez, in response to Canizalez's continued opposition to Beckwith's behavior, was a foreseeable consequence of the Board's failure to exercise a reasonable duty of care in its supervision and oversight of Beckwith and its failure to exercise a reasonably duty of care in affirming the hiring of Nelis.

128. As a proximate result of the Board's negligent supervision of Beckwith and negligent affirmation of the hiring of Nelis, Canizalez has suffered economic and emotional distress damages.

## COUNT III
## Wrongful Termination
## In Contravention of the Public Policy of the District of Columbia

129. Canizalez incorporates the allegations set forth in foregoing paragraphs as though fully alleged herein.

130. At all times relevant to this complaint, TASH employed Canizalez and controlled the terms and conditions of his employment.

131. At all times relevant to this complaint, both TASH and SABE were grantees or subgrantees of a federal reward.

132. Both TASH and SABE were bound by federal regulations governing recipients of funds from federal awards, namely 2 C.F.R. §§ 200.100, 200.101, 200.112, and 200.318.

133. These regulations espouse a public policy that impose upon both TASH and SABE legal duties to avoid conflicts of interest in applying for and receiving federal awards.

134. TASH, through the actions of its Executive Director Board of Directors, refused to disclose conflicts of interest related to the administration of federal funds.

135. The District of Columbia recognizes a strong public policy against conflicts of interest as evidenced by federal regulations governing conflicts of interest related to the administration of federal funds, namely 2 C.F.R. §§ 200.100, 200.101, 200.112, and 200.318.

136. TASH, through Beckwith, terminated Canizalez's employment a short time after he voiced opposition to TASH's actions, through Beckwith, of violating the regulations governing conflicts of interest related to the administration of federal funds.

137. TASH's termination of Canizalez, through Beckwith, and affirmed by the Board of Directors, violated the public policy.

138. As a result of TASH's terminating Canizalez's employment, Canizalez has suffered economic and emotional distress damages.

## PRAYER FOR RELIEF

139. Plaintiff Edwin Canizalez respectfully requests that the Court enter judgment in his favor and award him the following relief:

a. Reinstatement or front pay;

b. Economic damages for lost back pay, including twice the amount of lost pay and interest on the lost pay;

c. Compensatory and special damages for, including but not limited to emotional distress and reputational damage;

d. Costs and attorneys' fees;

e. And any other relief that this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff Edwin Canizalez hereby demands a trial by jury for any and all issues proper to be so tried.

Dated: March 27, 2017

Respectfully Submitted,

R. Scott Oswald, DC Bar No. 458859
Andrew M. Witko (to be admitted *pro hac vice*)
The Employment Law Group, P.C.
888 17th Street, NW, 9th Floor
Washington, D.C. 20006
(202) 261-2803
(202) 261-2835 (facsimile)
soswald@employmentlawgroup.com
awitko@employmentlawgroup.com
*Counsel for the Plaintiff*